THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THEODORE LUCZAK, Defendant-Appellant.

First District (1st Division)    No. 1—97—2763

Opinion filed June 14, 1999.—Rehearing denied August 17, 1999.

Michael J. Pelletier and Linda Eigner, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Jennifer C. Zucker, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:
Defendant, Theodore Luczak, appeals his conviction for two counts of aggravated criminal sexual assault. Defendant asserts that the trial court erred in allowing the State to introduce in its case in chief evidence that defendant sexually assaulted a different victim six years prior to the current charges.

Prior to trial, the State moved to introduce into evidence defendant's prior crime, arguing that evidence of the other crime showed defendant's intent at the time of the charged crime and

established defendant's *modus operandi*. Over objection, the trial court granted the motion and stated that the other crimes evidence demonstrated defendant's *modus operandi* and intent.

At trial, the complainant, S.S., testified that on April 22, 1995, between 9 and 10 p.m., she was walking home from the train station in Hammond, Indiana, when she saw a white Cadillac Sedan Deville with a burgundy top pass her. Inside the car, she noticed two Hispanic males in the backseat and one white male, the defendant, driving. While S.S. continued to walk home, she saw the vehicle drive around the block and stop at a house near her, at which point the two Hispanic passengers exited the vehicle.

S.S. further testified that the vehicle either made a U-turn or drove around the block again before slowing down next to her. Defendant was alone in the vehicle. Defendant started to talk to S.S. and inquired as to her name, whether she had a boyfriend, and whether she liked to party. S.S. responded that she did not want to party and that she had a boyfriend. Defendant then offered S.S. a ride home and she agreed, because it was cold and she was only wearing a skirt. S.S. also asked defendant for his driver's license, for assurance, and he gave it to her to hold.

S.S. testified that defendant was polite and outgoing. After S.S. told defendant that she liked to dance, defendant stated he worked as a disc jockey at a nightclub in Chicago and that he was going to work. Defendant offered to take S.S. with him to the nightclub that evening and promised to drive her home after his shift ended. S.S. agreed to go but only if defendant first met S.S.'s sister. S.S. testified that defendant drove her home and S.S. introduced defendant to her sister. S.S. stated her sister told her that defendant was "all right" and seemed "harmless." Defendant and S.S. left her house.

As defendant and S.S. drove through the southeast side of Chicago, defendant stated that he needed to get some money and drove to a nearby house. While S.S. waited in the car, defendant went into the house for five to eight minutes. Within a block of driving away from the house, defendant stated he liked S.S.'s eyes and began to touch her face. S.S told him to stop. Defendant then stated that he used to be a high-ranking member of the Latin Kings street gang and that he used to engage in the gang practice of "pulling a train." S.S. knew this gang practice involved gang-raping a woman.

S.S. next testified that defendant started to drive around the neighborhood and called her a "tease." Defendant's tone and demeanor suddenly changed. Defendant threatened S.S. and told her if she did not do as he said, he would "blow [her] head off" or force her to engage in a gang rape. He also threatened to kill her sister, child,

and boyfriend and threatened to blow up her house. S.S. then noticed a blue van drive by and pull up parallel to defendant's car. S.S. saw at least two people in the front of the van. Defendant recognized the people in the van and flashed them gang signals. The van then followed her and defendant.

S.S. testified that the defendant told her that the people in the van were his "home boys" and were former members of the Latin Kings street gang. While the van was following them, defendant told S.S. to remove her clothing and do what he wanted or she was going to "pull a train" with the individuals in the van. Defendant also threatened to throw her into the river if she refused. Defendant continued to make these threats with the van following his car for approximately one half hour. S.S. tried to appease defendant by telling him that she would do what he wanted.

At this point S.S. testified that, while still driving, defendant unzipped his pants and demanded that S.S. perform oral sex on him. He told her if she refused, she was going to "pull a train" and that he would kill her. Defendant then grabbed S.S.'s neck, pulled her down, and forced her to perform oral sex on him.

S.S. next testified that defendant told her he wanted to have sex with her. Trying to avoid this, S.S. responded that she had a yeast infection. Defendant stated that he would have anal intercourse with S.S. Defendant continued to threaten S.S. and her family, and, as a result, S.S. agreed to have anal intercourse with defendant. Defendant then made a hand signal to the van, and it drove away. S.S. testified that defendant parked in a secluded alley on the southeast side of Chicago and engaged in anal intercourse with her in the backseat of the car. After several minutes, S.S. begged defendant to stop and defendant stated that he would let her go at midnight.

S.S. next testified that she noticed the clock on the dash board read midnight and told defendant that he promised to stop and take her home. Defendant told her to shut up and said: "You're going to die. You're pulling a train." Defendant continued to assault her. Now believing that she was going to die, S.S. stated that she became crazed and she started to scream and beat defendant. Defendant attempted to calm S.S. down and agreed to take her home. After driving for a few minutes, defendant began to threaten S.S. again. S.S. told defendant that if he did not take her home, she would kill him.

S.S. testified that she was afraid that defendant was going to drive her to an unfamiliar area. She therefore grabbed the wheel and took the keys out of the ignition. Defendant and S.S. fought over the keys. After S.S. grabbed defendant's throat, he again agreed to take her home. Defendant told S.S. that if she went to the police, he would tell

the police that she was a prostitute and that she agreed to have sex with him for $500. Two blocks from S.S.'s house, she exited the vehicle and walked home. S.S. told her sister what happened and they drove to the hospital.

On the way to the hospital, S.S. and her sister flagged down a Hammond police officer who informed them that he would call the Chicago police department and have police officers meet her at the hospital. S.S. was treated at the hospital and spoke to Chicago police officers. On April 24, 1995, S.S. identified defendant in a lineup.

Based on complainant's description of defendant's car, the police located defendant two days later. Detective George Winistorfer testified that on April 24, 1995, at 9:15 a.m., he first spoke with defendant alone at the police station. Defendant stated that he did pick up S.S. in Indiana while driving a rental car, went to her house, and agreed to go with her to a nightclub in Chicago. Defendant stated that, while driving to Chicago, S.S. hinted of acts of prostitution and told him she would do anything for $500. Defendant stated that he dropped her off at the nightclub. Because he was not dressed for the club, he did not go in with her, but drove around for an hour. Defendant then drove S.S. home to Indiana. Again, S.S. offered to have sex with defendant for $500 but defendant declined. Defendant stated he dropped her off a block from her house and no sex acts occurred between them.

Defendant was identified in a lineup by S.S. and her sister. When he was told about contradictions between his and S.S.'s statements and the fact that S.S. was injured, defendant changed his statement. Defendant stated that on the way back from the night club, defendant engaged in anal sex with S.S. for money. After sex, defendant told S.S. that he did not have $500. Defendant stated that S.S. became angry, hit him, and choked him. Defendant drove S.S. home.

Detective Winistorfer next testified that an assistant State's Attorney informed defendant that he would be charged with criminal sexual assault. Defendant began to cry, stated that he had a problem with women, and sometimes could not control himself. Defendant then stated that S.S. was telling the truth and that defendant had forced S.S. to engage in oral and anal sex. Defendant, however, refused to sign any written statement and therefore defendant's statements were not reduced to writing.

The State then introduced defendant's prior crime. N.D. testified that on February 14, 1989, she was waiting for a bus to go to school. Defendant drove up and offered her a ride, which she accepted because she was running late. Defendant did not drive directly to N.D.'s school but talked about his gang membership with the Latin Kings and that he had to "violate" her. N.D. knew this term to refer to the rape of a

woman. Defendant then drove to a secluded alley near the lake on the southeast side of Chicago. Defendant told N.D. that if she did not cooperate, he would kill her by throwing her into the lake and drowning her. Defendant also called N.D. a "tease." In his car, defendant first tried to engage in oral sex but N.D. fought him off. Defendant then forced N.D. to engage in vaginal and anal intercourse. After finishing, defendant drove N.D. to school and told her not to tell anyone.

After the State rested and the trial court denied defendant's motion for a directed verdict, defendant testified. Defendant stated that on April 23, 1995, he drove to Hammond, Indiana, to help a friend move. On his way back to Chicago, friends in his car noticed a woman, S.S., walking down the street and asked defendant to check her out. Defendant hesitated at first, but then drove around the block and pulled up to her. Defendant's friends exited the car and talked to her. Defendant's friends then told defendant that S.S. was looking for cocaine. Defendant stated he did not have enough money to buy cocaine and he needed to go to the south side of Chicago to get money. S.S. first asked for a ride home, and defendant and S.S. went to her house, where he stood at the front door while S.S. talked to her sister.

Defendant then drove to his friend's house on the south side of Chicago to obtain the cocaine that S.S. agreed to buy. Defendant went into his friend's house, obtained the cocaine, and brought it back to S.S. in the car. S.S. asked if she could inspect the cocaine and said she needed a cup of ice water. Defendant drove to McDonald's to get the cup of water and gave it to S.S. While parked on a busy street, S.S. tested the cocaine in a pipe. Following the test, S.S. told defendant that she wanted all the cocaine for $500. Defendant replied that it cost $900.

At this point, defendant testified that S.S. "flipped out." S.S. threatened to tell the police, her brother, and her boyfriend that defendant was a drug dealer. S.S. started to fight defendant and punched him. Defendant did not fight back but told S.S. to leave his car. Defendant testified that he became paranoid and was afraid that the police would drive up. Defendant kicked S.S. out of the car, and he drove home.

Defendant then testified that he went to the police station two days later, after police officers came to his house and told him that his vehicle had been involved in a criminal sexual assault. Defendant stated that he refused to make a statement to the police officers and denied ever making any statement to Detective Winistorfer. Defendant testified that if he had made a statement, he would have signed it.

After arguments and deliberations, the jury found defendant guilty of two counts of aggravated criminal sexual assault. The trial court

sentenced defendant to consecutive prison terms of 40 and 60 years for defendant's convictions.

Defendant contends that the trial court erred in admitting evidence that defendant sexually assaulted N.D. six years prior to the alleged attack on S.S. The trial court instructed the jury to consider this evidence only for the limited purpose of defendant's identification and intent. Defendant asserts that because he acknowledged being with S.S. on the day of the alleged attack, but denied any sexual conduct, evidence of other crimes was not relevant to establish defendant's identity or intent.

■ In Illinois, other crimes evidence is relevant for any purpose other than to show a defendant's propensity to commit a crime. *People v. Robinson*, 167 Ill. 2d 53, 62, 656 N.E.2d 1090 (1995); *People v. McDonald*, 62 Ill. 2d 448, 455, 343 N.E.2d 489 (1975). Courts have recognized that other crimes evidence may be relevant and admissible in the prosecution's case in chief to prove *modus operandi*, intent, identity, motive, or absence of mistake. *People v. Illgen*, 145 Ill. 2d 353, 372-73, 583 N.E.2d 515 (1991). The trial court's decision to admit evidence of other crimes will not be reversed absent a clear abuse of discretion. *People v. King*, 248 Ill. App. 3d 253, 268-69, 618 N.E.2d 709 (1993).

Because of the potential prejudicial effect of other crimes evidence, the prosecution must identify similarities between the other crime and the crime charged to ensure that the other crimes evidence is not offered merely to show propensity. *People v. Johnson*, 239 Ill. App. 3d 1064, 1074, 608 N.E.2d 36 (1992). Once that threshold of similarity has been met, courts have found other crimes evidence relevant in a sexual assault prosecution to prove defendant's criminal intent or lack of an innocent frame of mind. *Johnson*, 239 Ill. App. 3d at 1074-75.

In *Johnson*, defendant was charged with aggravated criminal sexual assault and argued that the complainant consented to his sexual advances. *Johnson*, 239 Ill. App. 3d at 1075. The trial court allowed the prior sexual assault into evidence to prove defendant's absence of an innocent frame of mind. The appellate court affirmed and relied on the similarities between the two crimes. The court noted both victims were abducted in a the same manner and both victims were beaten, choked, and bitten. *Johnson*, 239 Ill. App. 3d at 1075.

Similarly, in *People v. Harris*, 297 Ill. App. 3d 1073, 1086, 697 N.E.2d 850 (1998), the court found that other crimes evidence was admissible to establish lack of innocent intent when defendant claimed consent and allegedly committed a prior similar sexual assault. The court again noted the similarities between the two crimes, such as the victims were abducted in the same area, were driven to a similar loca-

tion, were threatened, and were returned to locations where they lived or from where they were taken. *Harris*, 297 Ill. App. 3d at 1086.

■ In this case, like *Johnson* and *Harris*, defendant's two crimes were remarkably similar. Both victims were walking when defendant offered them a ride; defendant drove each victim to a secluded alley in the same area of Chicago; defendant threatened both victims by saying he would throw them into the lake or river if they did not agree to have sex with him; defendant called both women a "tease"; defendant wanted oral sex from both victims; and defendant assaulted the victims anally. Defendant spoke to both victims about his affiliation with the Latin Kings. Additionally, defendant attacked both victims in his vehicle; defendant made similar threats to each victim and called them similar names; and defendant drove them to the location that each victim was going after he attacked them.

Although defendant contended no sexual conduct occurred between him and S.S., he did claim that he and S.S. were together in his car. Defendant's testimony and S.S.'s testimony agreed that defendant offered her a ride, drove her to her house, and that they both left S.S.'s house in defendant's car. From there, the testimony substantially differed. S.S. testified that defendant drove to the southeast side of Chicago, threatened her, and eventually attacked her. Defendant, however, testified that he only possessed an intent to assist S.S. in purchasing cocaine and stated he briefly drove her to a friend's house and to a McDonald's restaurant. Clearly, defendant's intent was a central issue for the jury to decide. Therefore, evidence of defendant's prior crime was relevant to show defendant's intent at the time he was with the victim, specifically that defendant's intent was to sexually assault the victim.

Defendant relies on *People v. Bobo*, 278 Ill. App. 3d 130, 662 N.E.2d 623 (1996), where the court found error in admitting an investigator's account about other sexual abuse allegations against a teacher on trial for abusing one of his students. However, in that case, defendant denied he ever was with the student he allegedly abused and, additionally, the trial court allowed the investigator to talk about other allegations of abuse that lacked similarities with the crime charged. By contrast, in the case at bar, defendant admitted that he was with the victim on the date the alleged crime took place. Moreover, defendant's prior crime and the current charges contained remarkable similarities as to the manner in which defendant attacked both victims.

Defendant also cites *People v. Woltz*, 228 Ill. App. 3d 670, 592 N.E.2d 1182 (1992). In that case, the court found error in the admissibility of other crimes evidence in a criminal sexual assault prosecution to show defendant's absence of mistake or common design. *Woltz*,

228 Ill. App. 3d at 674. The court noted that defendant never claimed that the conduct underlying the criminal sexual assault charge was accidental, and therefore the other crimes evidence was not admissible to show absence of mistake. Moreover, because the prior crime and the charged crime did not show sufficient similarities to prove a distinctive pattern of criminal behavior or *modus operandi*, the court concluded that the evidence was not relevant to show common design. *Woltz*, 228 Ill. App. 3d at 674-75. The court, however, did not discuss whether evidence of defendant's other crime was relevant to show intent.

In this case, defendant's intent for offering and giving S.S. a ride was in dispute. Defendant did not deny that S.S. was with him on the date of the alleged crime and at the place of the alleged crime, defendant's vehicle. Therefore, evidence of defendant's other crime was not only relevant to prove defendant's criminal intent to commit a forced sexual assault on S.S. but to show defendant's intent for seeking out the victim and being with the victim, a contested issue at trial.

We further note that, in contrast to *Woltz*, defendant's prior crime was relevant as proof of defendant's *modus operandi*. The State additionally sought to introduce the other crimes evidence on this basis prior to trial. While general similarities between a prior crime and the charged crime satisfy the threshold of admissibility when the State offers the prior crime to prove intent or lack of an innocent frame of mind, the factual similarities between the two crimes must be highly identifiable for the prior crime to be admissible as *modus operandi* evidence. *Johnson*, 239 Ill. App. 3d at 1074.

This court has stated, "Evidence of other crimes may be admissible as proof of *modus operandi* only upon a strong and persuasive showing of the similarity between the crime charged and the separate offense; there must be a substantial and meaningful link between the offenses being compared." *Harris*, 297 Ill. App. 3d at 1087. Therefore, when offered as *modus operandi* evidence, the two criminal acts must exhibit a pattern or signature in the defendant's behavior from which the jury can infer that the conduct is consistent with the acts of one perpetrator. *People v. Jones*, 156 Ill. 2d 225, 240, 620 N.E.2d 325 (1993).

As discussed above, the defendant's crimes against S.S. and N.D. possessed strong and remarkable similarities. Defendant approached both women while driving his car and offered both women a ride. After luring each woman into his car, defendant used his affiliation with the Latin Kings street gang to intimidate and threaten the victims. In both cases, defendant drove the victims to a remote alley and threatened to kill the victims by throwing them into the lake or river

if they did not have sex with him. Defendant called both women a "tease" and, at first, attempted to force both victims' heads on his penis. Finally, in both cases, defendant assaulted the victims anally; however, in N.D.'s case, defendant also penetrated her vaginally. Defendant then drove both victims to the location they originally intended to go to before encountering defendant. Defendant's behavior constituted a distinct pattern or signature and thus the other crimes evidence was properly presented to show *modus operandi*.

Defendant argues because his identity was not an issue at trial, any other crimes evidence to show his *modus operandi* was irrelevant. In *People v. Pitts*, 299 Ill. App. 3d 469, 701 N.E.2d 198 (1998), the court rejected this argument and held that once the defendant denies the charges in a criminal sexual assault prosecution and attacks the credibility of the victim, *modus operandi* evidence is relevant to "the issue of whether defendant committed the charged crimes." *Pitts*, 299 Ill. App. 3d at 476. Moreover, in *People v. Fuller*, 117 Ill. App. 3d 1026, 454 N.E.2d 334 (1983), the court found that other crimes evidence was admissible to demonstrate *modus operandi* even though identity was not an issue and the allegation that sexual contact occurred was denied. *Fuller*, 117 Ill. App. 3d at 1034. The court reasoned that distinctive and identifiable similarities between a prior sexual assault and a current sexual assault charge are relevant to the issue of whether a crime was actually committed. *Fuller*, 117 Ill. App. 3d at 1034. "Evidence of a defendant's *modus operandi* may be relevant not only to the issue of who committed a crime but also to the issue of whether a crime was committed at all." *Fuller*, 117 Ill. App. 3d at 1034. Here, defendant's assault on N.D. demonstrated a pattern or signature from which the jury could infer that defendant sexually assaulted S.S. and committed the crime charged. The striking similarity of the other sexual assault was relevant to the issue of whether a crime was actually committed.

We recognize that other crimes evidence is not admissible solely to bolster the testimony of the victim or other prosecution witnesses. *People v. Kimbrough*, 138 Ill. App. 3d 481, 488, 485 N.E.2d 1292 (1985). Where, as here, the testimony of the victim and the defendant conflicts, the jury is faced with a credibility dispute and evidence that defendant committed another crime may impact the jury's decision on this issue. However, if the other crimes evidence is relevant for a proper purpose, such as to prove intent or *modus operandi*, it will not be excluded merely because it may enhance or bolster the credibility of the victim. *Kimbrough*, 138 Ill. App. 3d at 488.

Defendant further argues that prejudicial effect of the other crimes evidence substantially outweighed any probative value. The trial

court's use of a limiting instruction, however, substantially reduces the prejudicial effect of the other crimes evidence. *Johnson*, 239 Ill. App. 3d at 1075. In this case, the trial court instructed the jury to limit its consideration of evidence of defendant's other crime to issues of identity and intent. Although the instruction lacked language on *modus operandi* evidence, it did provide a sufficient safeguard that the jury's consideration of the other crimes evidence was limited and not used to show propensity. Faith in the jury to follow instructions and separate issues is "the cornerstone of the jury system." *Illgen*, 145 Ill. 2d at 376.

It is within the sound discretion of the trial judge to determine whether the evidence of other crimes is relevant to a material issue and whether the probative value outweighs its prejudicial impact. *Illgen*, 145 Ill. 2d at 375. We conclude that the trial court did not abuse its discretion in admitting evidence that defendant committed a prior sexual assault.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

TULLY and GALLAGHER, JJ., concur.